and from the from and from and from and from and from and from and 1964 Biogen Incorporated against the director of the PCO, Ms. French-Brown. Good morning, Your Honor. So we've reserved three times for rebuttal. May it please the court, I'm Wanda French-Brown on behalf of Appellant Biogen, the owner, the patent owner of the 873 patent. The board here made a number of errors in determining that all claims of the 873 patent are obvious in view of a five reference combination. The board error in concluding that there was a motivation of success, motivation to combine, which constitutes a legal error and lacks substantial evidence. The board's decision that there was a reasonable expectation of success likewise constitutes legal error and lacks substantial evidence. Third, the board error in finding that claim four is obvious because not one of these five references... But those are both questions of fact. So how is it that there are legal errors? So motivation to combine a reasonable expectation of success is viewed from the perspective of a person's skill in the art. The board did not do that here. And because it's viewed from the perspective of a person's skill in the art, it's also a question of fact. And the experts here have factually testified consistently with each other with regards to motivation to combine that in order to combine these references, they would want to see evidence that a two-treatment combination was better than a single treatment for DLCL patients over 60 before adding a third treatment. I guess I'm not understanding how that's a legal question as opposed to a factual one. Well, obviousness is a legal determination that's grounded in fact. So I guess the root of the argument is that it's... But we've expressly said on many, many cases that whether or not there is a motivation to combine, and what that motivation to combine is, is a question of fact. Yes, you're right. It's a question of fact because it's viewed from the perspective of a person's skill in the art. The board ignored undisputed factual evidence in the record as what a person's skill in the art would say they would do to combine these references. And here, you know, Dr. Ozer's testimony at Appendix 987, Dr. Call's testimony at Appendix 1125, they said that they would want to see that a two-treatment combination was better than a single treatment before adding a third treatment. Not one of the five references provides any clinical data or results comparing two treatments to one in patients over 60 with DLCL. This is undisputed. That would be a 102 reference, though. We're dealing with 103. Well, they combine five references. So none of the references, either collectively or together, compares a two-treatment combination to one. A 102 reference would be comparing all three. The claim is just for treating DLCL in patients that are over 60. Is that right? That's right. Combining three treatment combinations. And it's not treating DLCL in patients over 60. That's better than just doing CHOP therapy alone. Well, is that right? The claim isn't written that way. The claim is not written that way, but when you motivate to combine it viewed from the perspective of a person's skill in the heart. And what they've told us here in this case, that in order to add, before adding a third treatment to a very sensitive patient population of patients over 60 that were more prone to toxicity with CHOP alone compared to younger patients, they would want to see a two-treatment that were better than one before adding yet a third treatment to the very sensitive patient population. Why wouldn't the hypothetical skilled artisan be motivated here when we have Link that actually combined, did a test on humans combining CHOP with Rituximab or whatever it's called. And then we have another one, McNeil, that says, I am going to run a clinical, a human clinical trial on patients over 60 using Rituximab and CHOP chemotherapy. I mean, there's a question of whether a hypothetical skilled artisan would have been motivated, but then we have evidence of people actually doing it. I mean, that seems even stronger than the hypothetical question of one would have been motivated. People were actually doing it. Link is not a study for patients over 60 with DLCL. Link, and it's undisputed that Link does not identify any patient. Right, the average age is 49 over there. But then we have McNeil, which is specifically talking about this looks good for people over 60. This is what I'm going to do. I, McNeil, am motivated and am going to do this particular human clinical trial. So that, that sounds like pretty strong evidence when you actually have someone saying they're going to do it as evidence that people would be motivated because there was at least one person, McNeil, who was going to do it. Well, McNeil does not disclose any study design, any details, or any results. In fact, McNeil says that patients over 60 have been excluded from clinical trials, so we need to conduct this pilot study. Moreau, on its face, says age was the most single prognostic factor. And because of that, there needs to be a study designed specifically for patients over 60. Link has nothing to do with patients over 60. And it's conceded that it doesn't identify any patients over 60. The board doesn't explain why a person skilled in the art would nonetheless rely on Link when patients over 60 weren't included in that study. And it's also undisputed that elderly patients react to treatment differently than younger DLCL patients. That's found in the record of Dr. Sulfur's deposition at a pandemic. And so, I mean, I understand your arguments with regard to Link, but does that matter if McNeil otherwise expressly says to make this combination of CHOP and Rituxan? Yes, it matters because Link is not a study of patients over 60. And McNeil says we need to have a study for patients over 60 because they've been excluded. And actually identify a presidential panel that criticizes current studies that didn't include the special patient populations of patients over 60. Also, Link, even though the patients were under 60, identifies a significant number of toxicities. For example, at appendix 257, eight patients had grade four toxicities, which is the worst. Yes, but McNeil tells you to do this. Why isn't it at least obvious to try after he's expressly said to do it? Well, I don't think Link expressly says to do it. McNeil does. McNeil suggests that there should be a study and McNeil actually goes further to say that there should be a CHOP alone compared to CHOP and a second treatment. McNeil does not disclose that the study doesn't design. It doesn't disclose details or results. And so the experts here, with regards to reasonable expectations of success, has testified consistently with each other that they would want to see study results that show that there's an improved prognosis. Now, going back to Link, 14 patients had grade three toxicities, eight had grade four. That's over 65% of younger patients experiencing toxicities. And its experts have confirmed that elderly patients are more prone to toxicity. Well, didn't Link say its combination of rituximab and CHOP quote, represents a tolerable therapy with serious adverse events occurring with a frequency similar to that seen with conventional CHOP therapy alone and may offer higher response rates. For those patients who were not over 60. But I thought now you were saying it was more dangerous than doing CHOP therapy alone. And at least according to this quote, it sounds like no, that's not what Link was saying. Link was saying it's no worse than doing CHOP therapy alone in terms of adverse events. But in addition to that, it may offer higher response rates. That's not for patients over 60. No, we've got that through McNeil. Right, so no, McNeil says that you need to have a study designed for patients over 60 because they respond to treatment differently. So the experts have testified consistently with each other that DLCL patients over 60 had worse response to treatment and was worse tolerability treatment. CHOP was more, was the standard of care for patients. How about Coffier? Coffier was a study, a single study, of rituximab and patients over 60. So you're saying that rituximab has significant activity in DLCL, including those above 60? Yes, so Coffier was a study, a monotherapy study for rituximab administered to patients over 60. It was a single study. And even in that study, if you look at Appendix 261, 25% of Arm A experienced adverse events and 31% in Arm B experienced adverse events. So, going to the reasonable expectation... I'm reading it, A258, in this first trial of rituximab and DLCL, patients experienced a significant clinical activity with a low toxicity. Rituximab has a significant activity in DLCL and MCL patients and should be tested in combination with chemotherapy in such patients. Right, so Coffier does not identify any responders being greater than age 60. I mean, there are some patients in that study that are over age 60, but it doesn't identify any responders that are over age 60, and that's even conceded by Dr. Coffier in his deposition at Appendix 1801. Going back to reasonable expectation of success, the board failed to view the reasonable expectation of success from the person skilled in the art. And so what the experts have testified consistently with each other here is that a reasonable expectation of success meant to them an improved prognosis for patients over 60. And even petitioner and their... Where do the claims require that? Because I only understand the claims to recite treating DLCL in patients over 60. I don't understand the claims to suggest it has to improve, that this particular method of treatment has to improve their prognosis. Right, so... Over individual therapies, for example. Improved prognosis is not expressly written in a claim, but reasonable expectation of success is viewed from the perspective of a person skilled in art. And in this case, all experts agree that a reasonable expectation of success meant to them an improved prognosis in patients over 60. For example, Dr. Coffier, in his deposition at 1786, said if we just talk about patients over the age of 60, successful treatment would mean improving the prognosis of patients over 60. That's consistent with Dr. Coffier's deposition at 1786, 985. And as this court has recognized recently in OSIV-Apotex, cancer treatment is highly unpredictable. So similar to OCI, here we have no clinical data to suggest that there's going to be an improved prognosis in patients over 60 with a two treatment combination. And the lack of clinical data here is even more significant because we have the person's skill in art telling us what they... What reasonable expectation of success meant to them. It meant an improved prognosis. And in fact, petitioners in their original petition for IPR at Appendix 120, they acknowledged that the general problem confronted by the inventor before the invention was made was whether new therapies would have improved the prognosis for patients over 60. There's no evidence in the record. I have a stupid factual question, but when you're talking about improved prognosis, so if you take two particular therapies to put together like CHOP and Rituxan, I can't say. We put these two together. Are you talking about improvement over either one of them individually or improvement over something else individually? It's improvement over one of them individually. So if you take CHOP and Rituxan, they said that they want to see that toxin Rituxan is better than CHOP alone before adding a third treatment for patients over 60 with DLCL. So the board also erred in claiming in their determination that Claim 4 is obvious. So Claim 4 requires patients over 60 with DLCL that involves bone marrow involvement. And so McNeil, Moreau, and Link do not disclose any treatment for patients with bone marrow involvement. Colfer does not disclose whether any of the seven patients with bone marrow involvement were DLCL patients. And Colfer doesn't disclose treatment of elderly patients with bone marrow involvement. So what the board did is they really conflated and collapsed Claim 4 into Claim 1 rather than looking at Claim 4 requirements separately. There's no reasonable expectation of success here that combining these references will somehow improve the prognosis of patients over 60. I didn't hear you say anything about Maloney. Yeah, Maloney is a reference that it only had two patients with DLCL and Maloney does not identify any of those patients as being greater than 60. Well, they have bone marrow involvement, is that right? Maloney doesn't identify those patients that have bone marrow involvement that were over age 60. And that's the problem with Maloney. And that's actually recognized by Dr. Ozer in his deposition at Appendix 1013, starting at line 11, that all the responders who are patients, and all the responders in Maloney are patients with low-grade non-Hodgkin's lymphoma. And so the experts have testified consistently that identifying the greater lymphoma is going to dictate treatment. So the board didn't explain, despite the fact that low-grade lymphoma was disclosed in Maloney, why a person with skeletal heart would rely on that when the experts say that identifying the type and grade of lymphoma dictates the treatment plan. And in this case, we're talking about a sensitive patient population over 60 with an aggressive form of lymphoma. I believe my time is up. Let's hear from the other side. We'll save you rebuttal time. Ms. Craven, I guess I said the other side, but you're not the other side. What happened to the petitioner in this case? The petitioner dropped out, Your Honor. May it please the court. So the director, as their statutory, under their statutory authority... Well, I'm not sure. The statute says that the director has the right to intervene, but it doesn't say the director has the right to take sides when the other side has dropped out. And I think this is a curious situation in that here we have this board that is being treated like a tribunal, but isn't it curious for the decision-maker, the judge, to come in and to defend the decision when the winning party refuses to do so? Well, Your Honor, this court has already decided and knows that the director does have the statutory authority to step in in this situation, and we're here to defend the board's decision just like we do in ex parte cases as part of the agency defending the agency's decision. And I think that it helps the court then to really understand the merits of the case to actually have two parties disputing them. I think we're trying to understand the role of the PTAP, which is doing its best to be treated like a tribunal. And yet, unlike any tribunal otherwise, if the winning party drops out for whatever reason, then the tribunal comes in to defend itself. Well, respectfully, Your Honor, we represent the agency. This is the director's decision through the PTAP. The tribunal is part of the agency. It's not a separate judicial branch activity. It's an agency activity. Right. And we're here to try and help Your Honors then to make the best decision based on what our understanding of the board's decision and to give you the other side of the story. So there's not just Biogen here alone. And I understand your position, but this court in Knowles did say that we have the statutory authority to be here, and that isn't something we've briefed again in this case. So respectfully, I'd like to perhaps continue then on the merits. Okay. All right. Let's proceed with the merits. But on the merits, as long as I've interrupted you, I couldn't find anywhere in the prior art, in the record, a suggestion to make this combination. How do we distinguish what was actually done? I'm viewing it in hindsight that, yes, it's a good idea. And a suggestion in the prior art that this should be done, and it will work. Not to go out and experiment. We know these are extraordinarily complex biological, physiological events that take place with antibodies and all this stuff. So we need, that's what I'm looking for, so help us if you're here to help us. Yes. Where there's a suggestion to with likelihood of success, not go out and do some experiments, but that this will work. Because the FDA doesn't seem to think so. They made them go through the whole FDA process for approval. Right. So there's a lot there, Your Honor. Let me see if I can unpack that and give you the answers that you require. So, starting with just the primary reference here, Moreau, it has a therapy that it says... You can find these activities in separate references. I'm looking at the combination. Right. So Moreau teaches all the limitations of the claim, Your Honor, except the addition of the CD20 antibody, Rituximab. We can just call it the antibody. That might be easier for everyone. And that's for the exact patient population that's claimed. Older patients that have DLCL. And the question then, the motivation question that Your Honor is getting at, is the motivation then to add the antibody to that method. That's how the board is framing the motivation to combine. And what the board looks at with the other prior art is, in fact, that there is explicit statements in the prior art to make the combination. Link is a study that combines Rituximab and CHOP in DLCL patients and shows an increased efficacy over CHOP alone, a 96% efficacy without any increase in toxicity, which is suggesting to someone that you can get a better efficacy with adding Rituximab without extra toxicity. And the older patients are the exact patient population that have this problem with toxicity with CHOP. That what McNeil says is this is the patient population where we need alternative therapies. And that exact alternative therapy that McNeil suggests is CHOP with Rituximab. And a perspective, there's going to be a clinical study on that. In retrospect, but it wasn't obvious to the regulatory agencies, to the FDA. So who are the judges to say, well, it's obvious to us. We know better. So the requirements for FDA approval are much more stringent in terms of... They're just different requirements than for obviousness. They're stringent. They're very stringent. And we're talking about really extraordinarily complex biological properties. But I don't know what your what your honor is referring to when you said the FDA hasn't approved this. We have FDA approval to do stem cell transplantation, which involves a CHOP therapy. And Rituximab, Rituxan, is an FDA approved therapy. And people are using them in clinical trials and finding that they're getting success in that they're having responses from patients with DLCL and including people who are older patients with DLCL. So I'm not sure what the regular agency has said about clinical trials for this particular combination. That's not in the record. But this court has repeatedly said whatever the standard is for an FDA trial, it's not what the standard is for obviousness. The board, there's substantial evidence for the board's motivation to combine finding. We haven't even talked about Malhoni, which Malhoni is a study of Rituximab. Is the palette correct that all of the experts in this case agreed that reasonable expectation of success would hinge on an improved prognosis as compared to an individual drug, that you wouldn't add a third treatment until you knew adding two was better than just any one of them by themselves. So Pfizer's experts did make general statements to that effect, but they were not tied to the specific facts of this case. So I believe it was their expert definitely testified to it at 1257. And then I thought the Pfizer expert also did at 1785 to 1786. But I agree with what you're saying that they're more generalized statements. But given that all of the experts seem to have said, and no experts contradicted the notion, that in general you wouldn't think about adding a third drug in with this patient population, given the toxicity concerns, unless you were sure that the two you were already working with was better than either one of them individually. So two answers to that. First, the claims don't require any improved prognosis. So for a reasonable expectation of success, it has to be a reasonable expectation of what is claimed, and that is treating DLCO. And the experts can't change what the claims say through their expert testimony. And second, when the experts are saying this, I wouldn't add the third therapy... But it's a reasonable expectation of success in terms... reasonable expectation and motivation combined really go hand-in-hand. I mean, we've said they're interrelated. Yes. So why would somebody be motivated to add a third treatment in, given the toxicity concerns in this patient population, if they weren't sure that two treatments taken together were any better than one? It's that those two concepts are intertwined for me. Okay, so I think when Pfizer's experts said that, they was not saying it in the context of the specific facts of this case, and I believe Pfizer's expert understood this case based on the prior art that was written, that CHOP therapy as part of chemo... part of stem cell transplantation was already one conventional therapy for a certain population of patients with aggressive non-Hodgkin's lymphoma. So the motivation to combine issue was adding the antibody to what Moreau says is already the treatment of choice for a particular patient population. And the toxicity concerns are allayed because you don't see increased toxicity with Rituximab. You don't see it increase the toxicity of CHOP in the link study. It's just... it's the same toxicity as CHOP alone. And so, given that it's all... Well, it may be the same... if it's the same toxicity as CHOP alone, but is it the same toxicity as what Moreau discloses, which is what CHOP plus... Transplantation. So, both report not significant toxicity. There's no toxic deaths in Moreau. There's no organ toxicity. People do fail the trial with disease progression. But I think the point is, I don't... I don't seem to understand. I don't think the record includes, but please correct me, an articulation of Rituximab for just CHOP versus toxicity for stem cell versus toxicity for the two of them together. And wouldn't you need to know that before you're going to add a third in, which could further exacerbate the toxicity concerns? Right. I think the the framing, though, is when you're... there is no stem cell transplantation toxicity alone, because as Biogen's argument concedes, you do the chemotherapy as part of the stem cell transplantation. And if you don't respond to CHOP, you're not going to go on to the transplantation of the cells, the harvesting, and all that. And the toxicity associated with that entire therapy is what Moreau says is actually tolerable in the exact patient population that's claimed DLCL patients who are an older population. So the toxicity concern is of adding Rituximab to that combination. Whatever, it has some toxicity, yes, but not... no toxic deaths, no organ toxicity. And Rituximab, as a monotherapy, doesn't have those toxicity concerns. I guess here's the problem. These two things in Moreau, when taken together, were deemed tolerable. That doesn't... Tolerable, right, could be like just a borderline on the edge of, oh my god, don't do it again. You know, we don't know where that toler... I don't understand from Moreau precisely where something would cross the line. There seems to be no doubt that the additional treatment would increase toxicity. The question is by how much? I don't think there... I mean, I don't think people do think adding Rituximab would increase toxicity because... Why? But it increases... it causes toxicity in and of itself, by itself. The toxicity is... there's not a lot of adverse effects with Rituximab. There's some adverse effects with infusion. So it's true, there's going to be... But doesn't the record show that there is some toxicity caused by Rituximab? That doesn't overlap with the toxicity of CHOP. So when you give them... That wasn't what I asked you. What I asked you is, doesn't this record show that Rituximab has some attention to toxicity? It has some toxicity, but it's minor toxicity, and it's mostly... Yes, but I... minor, you know, like... When the water is about to cross over the dam, even one more drop might be too much. Right, and I think the thing is CHOP therapy is the more toxic therapy, and in Link's study, it didn't increase the toxicity with what you had with CHOP, and McNeil says the problem we have with older patients is that CHOP is very toxic in them, and we're looking for alternatives so we can dial back the CHOP, and one of the... One thing that McNeil expressly says we are going to do is test it with Rituximab for the older patient population. But that's the problem. Okay, we know CHOP is probably the large cause of the toxicity concern. Moreau says it added in the stem cell, and then it was tolerable, but it doesn't tell you whether it increased toxicity above what CHOP alone would have had. We only know it's tolerable. Tolerable to me seems like borderline. Tolerable doesn't seem like what you want to hear if you're hoping for, you know, a happy ending, right? It's just, you know, tolerable means, okay, this is gonna suck, but I'm not gonna die. You know, and so then you're talking about adding something which has been established by this record to increase toxicity, even if it's only in a minor way, and I guess my concern is when you're in this patient population, which is definitely sensitive, and you're talking about such a large number of references combining in such an unpredictable area, I am sort of not confident in what you've done. All right, two answers. One, in I think reading the tolerable therapy, we are talking about a very aggressive disease that these patients have, and 50% of them are surviving, which is what Moreau is saying this is a treatment of choice for salvage therapy for a certain group of patients who don't have a good prognosis. The review in the record says that CHOP therapy alone is the standard of care for people with poor prognosis, with good prognosis, and people who have poor prognosis, we're going to intensify with stem cell transplantation because they're not going to respond to CHOP alone. So yes, there's some toxicity associated, and definitely with the transplantation, but the problem is this is the therapy we have for these patients. The CHOP chemotherapy is part of all the stages you're going to do for stem cells. But that's the thing, I mean, you got the one level with this CHOP, you got the stem cell, which adds more, and then you say we should add a third, but the only reason to add a third is because there's some study out there that says number one and number three might be a good idea to add together. But what it doesn't suggest is one and two with the already more vulnerable population, already with the increased toxicity, is a good idea to add with three. And that's, I mean, I think you understand my concern. Yeah, I understand your concern. I will note that Melhoney does suggest once with the Rituximab to combine it with chemotherapy and stem cell transplantation, and you already have that therapy working in the exact patient population claimed. And the idea is you're adding the Rituxan at the same time you're reducing the CHOP therapy. That's it, yes. So Moreau's therapy reduces the six cycles to three cycles at the induction phase, and the idea is older patients can't handle the six cycles. We reduce CHOP. If we add Rituximab, Link tells us we are looking at a high level of efficiency in DLC patients, and in theory then it would also work in older patients because there's nothing, Rituximab is already safe and effective in that older patient population. Okay. Okay. Thank you. Thank you. Thank you, Ms. Craven. Ms. French-Brown. Thank you. I think the record is very clear that the experts have said what a reasonable expectation of success is in this case. It wasn't in a general sense. For example, Dr. Sophia at his deposition, Appendix 1797, starting at line 5, he says, oftentimes oncologists would be motivated to add a new drug, in this case Rituxan,   for a regimen that you've established and you think is safe to improve outcomes. Dr. Ozer, similarly in his deposition at Appendix 985, starting at line 11, states the purpose of using multiple drugs together is to increase both the efficacy, but unfortunately it may also, it may, it also may carry increased toxicity when they are used together, and this is consistent with Biogen's expert, Dr. Call. I guess I'm trying to understand, though, how to understand all of that in the context of patent law and trying to understand what is a reasonable expectation of success for accomplishing the claimed invention, and I can't tell if that testimony is linked to trying to understand how to, the words of the claim, treating DLCL patients that are over 60. Well, in the context of this case, the experts said, not, I'm not talking about in patent law journal, but the experts have read the claims and they understand that the field of the invention at the time of the priority. I understand their concerns as scientists and trying to find, you know, the next solution, but I'm also, you know, in a court of law where I have to give a lot of thought to how to apply the law here on obviousness and specifically reasonable expectation of success of the claimed invention, how to fit all of that within what these witnesses were testifying to. So reasonable expectation of success is viewed from the person's skill in the art. The experts have told us what that is. Reasonable expectation of success of the claimed invention. Right, and they said this is a method of treatment claim, and for, from their perspective, as persons of skill in the art, method of treatment. I'm just wondering, is there any case law where we have as a default rule that when it's a method of treating patients, the reasonable expectation of success requires and mandates that the claimed treatment is some quantum better than prior art treatments? I don't think there's any bright line rule or if there's any case law as a matter of law that this should be the standard. We're talking about in the context of this patent and the context of these claims. The factual record does not support the board's finding. The board didn't review the evidence from the perspective of a person's skill in the art, which means an improved prognosis. There's not one reference that suggests. This time's about to run out. With your permission, I'd like to ask a question. I mean, you're obviously much smarter and well understood on all these technology things than I am, and you've done a great job in that regard today explaining it to me. But my issues, which I think you may have heard in my dialogue with opposing counsel, I don't think hinge on me having to agree with you that a reasonable expectation of success involves increased prognosis as opposed to any individual therapy. I think I can still conclude a reasonable expectation of success in this case is just over no treatment at all, theoretically. But I think whether it's through the mechanism of motivation to combine a reasonable expectation of success, which are intertwined. Did you understand my arguments? Do you think I have to agree with you on this question you have about reasonable expectation of success in order to have the concern I do? Because I don't think I do. I think I can conclude you're wrong about that, but actually still may be fine in your favor, because I think reasonable expectation of success may not have been at all reasonable in light of the toxicity concerns. And I think that's independent of this argument that you're discussing now on rebuttal. But am I wrong? Is it not independent of that? Can you tell me? Are these things intertwined in some way that I don't understand? Right. So we take the position that a reasonable expectation of success is viewed from the person's skill and the art. We don't think the board should come in and say what... I understand what your position is, but do you understand the questions I have, which is I don't know why a skilled artisan would add a third in this patient population when the first two together were only tolerable. And the third definitely increases toxicity, given that they don't know. I don't think that's the same as the argument you're making. I mean, you made this argument on toxicity clearly in your brief, but it's not the one that you're talking about now, I think. So I agree with you. Even if you don't agree with our reasonable expectation of success standard, the board's decision of reasonable expectation of success is not supported by substantial evidence because you have Moreau, who does not say CHOP plus stem cell was the conventional treatment. CHOP alone was the conventional treatment. And Moreau states at appendix 265 that stem cell transplantation was usually restricted in patients less than 60 because patients older than 60 could not tolerate it. And Moreau does not compare CHOP and stem cell with CHOP alone. So what in the record tells us that, or suggests that the combination with this antibody is going to have a worse toxicity outcome? Well, that's the problem. There's no references that compare CHOP alone with CHOP plus for toxin. But the PTO agreed that the antibody therapy alone does have a degree of toxicity to it. So if you're, I don't know if you're adding toxicity from CHOP plus stem cell, and then you're adding on a treatment that in and of itself has toxicity, I don't see how that wouldn't increase the toxicity. Am I missing something? No, our position is that we agree with you. In fact, Pfizer's expert... What about LINC, though? Didn't LINC say the toxicity issue is no worse with the combination of rituximab and CHOP therapy? LINC was not a study for DLCL patients over 60. And Dr. Ozar in his deposition... It was for DLCL patients, but it says what it says about when you combine these two with those patients average age 49. I get that. But if I just step aside from that, on its face it says there's no worse adverse events compared to just using CHOP therapy alone. I don't think LINC provides any data comparing... I'm just saying what it says. Yeah, yeah. That is in fact what it says. That's what it says. But as Dr. Ozar recognized that LINC does not state that there is no overlap between a toxicity of a toxin and a toxicity of a CHOP. And if you look at the great three and four toxicities, 21 patients out of 31 experienced toxicities. And these are younger patients. So from what the experts tell us that you're going to see even more so an instance of toxicities in patients over 60. So it is our position that a person with a skill in art wouldn't even apply LINC to this combination. Just to be clear, am I understanding right that your argument is that because LINC only has a worse adverse effect doesn't mean that wouldn't be true for older people? Correct. Thank you, Your Honor. Anything else you want to ask? Thank you. Thank you. Thank you both. Case is taken under submission.